Sean H. O'BRIEN and Wendy L. O'Brien, William J. Snyder, and Renee Snyder, a/k/a Becky Renee Snyder, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**J.I. KISLAK MORTGAGE CORPORATION,**
Defendant.

**No. 94–1343–CIV–RYSKAMP.**

United States District Court,
S.D. Florida.

May 9, 1996.

Daniel A. Edelman, Cathleen M. Combs, O. Randolph Bragg, Edelman & Combs, Chicago, IL, Charles McLeon Baird, Atlanta, GA, for Sean H. O'Brien, Wendy L. O'Brien.

Thomas Emerson Scott, Jr., Eileen Louise Tilghman, Alison Clasby Harke, Davis Scott Weber & Edwards, Miami, FL, Robert Pratte, Alan H. Maclin, Mark G. Schroeder, Briggs & Morgan, Minneapolis, MN, for defendant.

Charles McLeon Baird, Atlanta, GA, for William J. Snyder, Renee Snyder.

### ORDER DENYING CLASS CERTIFICATION

RYSKAMP, District Judge.

THIS CAUSE comes before the Court by Plaintiffs' Motion for Class Certification [DE 18], dated September 27, 1994. After reviewing the record and applying the appropriate standards of law, the Court has determined that Plaintiffs' Motion for Class Certification should be denied.

## I. INTRODUCTION

This Truth in Lending Act ("TILA") action was commenced on July 1, 1994 in the United States District Court for the Southern District of Florida. The Plaintiffs allege that the Defendant, J.I. Kislak Mortgage Corporation ("Kislak"), and its assignors violated TILA, 15 U.S.C. § 1601 et seq., by systematically understating the "finance charges" and overstating the "amount financed" in numerous credit transactions. (2nd Am.Compl. ¶ 1.) Plaintiffs allege that it was the policy and practice of Kislak and/or its agents to do so when making TILA disclosures at or prior to the closing of residential mortgage loan transactions. (2nd Am.Compl. ¶ 25, 26.) Plaintiffs' Second Amended Complaint alleges that Kislak's practices in this respect violate the disclosure requirements of TILA (Count I), and constitute unfair and deceptive trade practices and unjust enrichment (Counts II and III).

This case was originally assigned to Judge Edward B. Davis who recused himself on October 17, 1994. The case was then randomly reassigned to Judge Federico A. Moreno. On September 27, 1994, Plaintiffs filed their Motion for Class Certification. Judge Moreno referred Plaintiffs' Motion for Class Certification to Magistrate Judge Ted E. Bandstra. On April 18, 1995, after the matter was fully briefed, Judge Bandstra conducted an evidentiary hearing regarding class certification. Judge Bandstra then issued a Report and Recommendation ("R & R") advising Judge Moreno to deny Plaintiffs' Motion for Class Certification. The Plaintiffs filed objections to Judge Bandstra's R & R and the Defendant responded in opposition to Plaintiffs' objections.

On August 8, 1995, before Judge Moreno acted on Judge Bandstra's R & R, this case was transferred to this Court as part of a block of similar Truth in Lending Act actions. The Court then stayed Plaintiffs' pending Motion for Class Certification in accordance with the Truth in Lending Class Action Relief Act of 1995, Pub.L. 104–12 (H.R. 1380), which provided for a moratorium on the certification of certain class actions brought under the Truth in Lending Act. The stay was automatically dissolved when the Truth in Lending Act Amendments of 1995, Pub.L. 104–29, were signed into law on September 30, 1995.

On February 7, 1996, the Court granted Defendant's Motion to File a Supplemental Class Certification Brief in Light of the Truth in Lending Act Amendments of 1995. The Plaintiffs responded to Defendant's Supplemental Class Certification Brief and filed a Claim of Unconstitutionality as to the TILA Amendments of 1995. The Defendant has responded to Plaintiffs' Claim of Uncon-

stitutionality and this matter is now ripe for adjudication.[1]

## II. FACTUAL FINDINGS

Having reviewed Judge Bandstra's R & R as well as the transcript of the April 18, 1995 evidentiary hearing and the appropriate portions of the record, the Court hereby adopts Judge Bandstra's Findings of Fact for the purposes of this motion for class certification:

1. Kislak is a Florida corporation engaged in the mortgage lending business from its principal place of business in Miami Lakes, Florida. Between September 1991 and September 1992, Kislak processed home mortgage loans in the approximate amount of $1.2 billion. Subsequently, Kislak has produced or processed loans at similar levels with an average loan balance of about $86,-000.

2. Kislak produces loans through a network of correspondents consisting of over 135 qualified mortgage lenders ("correspondents").[2] In most cases, these correspondents close loans in their own names, using local title companies, attorneys, realtors, or other third parties as closing agents. A closing agent is typically selected by a borrower, realtor, or correspondent lender or a combination thereof. The closing agent is ordinarily responsible for preparing and/or assembling the closing documents including the Truth in Lending disclosure statement.

3. After closing, a loan is serviced by the lender or another party who performs such tasks as collecting loan payments; collecting funds from the borrower for property taxes, insurance premiums, and other expenses; handling delinquencies, work outs, and foreclosures; and remitting payment to the lender who owns the loan.

4. Kislak has purchased hundreds of thousands of residential mortgage loans during the time period relevant to this action. Many of these loans have been purchased from correspondents who participate in Kislak's correspondent/wholesale program. Kislak uses a standard "Mortgage Loan Origination and Purchase Agreement" form with each correspondent. Pursuant to that agreement, Kislak provides underwriting guidelines, submission requirements, and funding policies and procedures to its correspondents to be used in the loan application and appraisal procedure. This agreement further provides that the correspondents are not Kislak's agent.

5. Kislak also distributes printed loan closing instructions to its correspondents. The loan closing instructions contain a list of closing charges and indicate that such charges are to be shown on the settlement statement. The loan closing instructions also contain a "Supplemental Government Loan Instruction Sheet" which states that certain fees, including Federal Express fees, other courier fees, express mail fees and other listed fees are "allowable charges" for FHA or VA loans. These instructions further provide that the loan is to be closed in the name of Kislak or the correspondent; and that the note, mortgage, settlement statement and all other closing documents are to be sent to Kislak within two business days of the closing/disbursement date.

6. While Kislak provides closing instructions to its correspondents which include instructions regarding closing fees, the evidence reveals that Kislak's correspondents maintain various practices with respect to whether such fees are actually charged to borrowers. Also, practices vary among Kislak's correspondents, other creditor/vendors and closers as to whether charges will be absorbed by the creditor/lender, paid by the seller, or paid by the buyer.

7. Aside from correspondents, Kislak acquires residential mortgage loan and servicing rights for such loans in other ways. Sometimes, Kislak acquires loans through bulk purchase from other institutional inves-

---

1. The Plaintiffs filed a Second Amended Complaint on September 22, 1995 and the Defendant answered on October 18, 1995. The Court has determined that Judge Bandstra's R & R remains relevant to Plaintiffs' Second Amended Complaint.

2. Correspondents are brokers, mortgage bankers, or other entities who deal directly with borrowers and realtors to originate loans and commonly shop those loans around to different wholesalers such as Kislak. (Tr.Evid.Hrg., pp. 75–76.)

tors or lenders. Kislak also acquires and services mortgage loans through housing revenue bond transactions established by state and local housing authorities. Kislak also originates some mortgage loans directly although such originations account for only about 1% of Kislak's current loan production.[3]

8. After acquiring whole loans, Kislak routinely sells them to a variety of investors in the secondary market, such as Fannie Mae, Freddie Mac or private investors. Thereafter, Kislak no longer owns the loan but may retain the servicing rights.

9. Plaintiffs, Shawn H. O'Brien and Wendy L. O'Brien (the "O'Briens") are residents of Massachusetts. The O'Briens entered into a loan transaction with Union Trust Mortgage Corporation ("Union Trust") on December 20, 1993, secured by a mortgage on their home located in South Hamilton, Massachusetts. Their loan was closed by the Massachusetts law firm of Apostolica, Gilmartin, Donovan & Donovan ("Apostolica"). The requested loan was to be secured by a mortgage with first lien rights on the O'Brien's home. Consequently, at closing, the O'Briens had to pay off two creditors with preexisting liens on their property. Apostolica arranged to pay off these prior loans for the O'Briens. The O'Briens received a number of documents at the closing, including a TILA Disclosure Statement and a HUD–1 Settlement Statement. On the HUD–1 Settlement Statement, a number of closing expenses were itemized including a $25.00 Federal Express fee. After the loan closed, Kislak purchased the O'Brien loan from Union Trust on December 23, 1993. Kislak had no contact with the O'Briens prior to the purchase of their loan. Kislak sold the O'Brien loan to the Federal National Mortgage Association ("Fannie Mae") on January 8, 1994, and agreed to service the loan for Fannie Mae following the sale.

10. Plaintiffs, William J. Snyder & Renee Snyder ("the Snyders"), are residents of Florida. The Snyders entered into a loan transaction with Granger Mortgage Corporation ("Granger") on April 19, 1993, which was secured by a mortgage on their home located in Sarasota, Florida. The Snyder loan was closed by Sun Coast One Title Company ("Sun Coast Title"). The Snyder loan was to be secured by a mortgage with first lien rights on their home. Consequently, at closing, the Snyders had to pay off three creditors with preexisting liens on their property. Sun Coast Title arranged to pay off these prior liens for the Snyders. The Snyders received several documents at the closing, including a TILA Disclosure Statement and a HUD–1 Settlement Statement. On the HUD–1 Settlement Statement, a number of closing expenses were itemized, including Federal Express and courier fees, a tax service fee, a review fee, a record subordination of mortgage fee, and the Florida intangible tax. After the loan closed, Kislak purchased the Snyder loan from Granger on April 23, 1993. Kislak had no contact with the Snyders prior to the purchase of their loan. Kislak sold the Snyder loan to Federal Home Loan Corporation ("Freddie Mac") on May 7, 1993, and agreed to service the loan for Freddie Mac after the sale.[4]

### III. LEGAL STANDARD

Before a prospective class may be certified, plaintiffs must show (1) that the four prerequisites contained in Rule 23(a) have been satisfied and (2) that one of the provisions of Rule 23(b) appropriately applies to the facts of the case. *In re Amerifirst Sec. Litig.,* 139 F.R.D. 423, 427 (S.D.Fla.1991) (citing *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 721 n. 2 (11th Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 421 (1988)). Under Rule 23(a), plaintiffs have the burden of showing that the following four requirements have been met:

---

**3.** Origination occurs in the first segment of the mortgage lending industry and refers to the process of negotiating, arranging, and funding mortgage loans to home buyers to either purchase a desired residence or to refinance their home purchase mortgage. *Myers v. Citicorp Mortgage, Inc.,* CIVIL ACTION NO. 94–A–1019 (N.D.Ala.,

June 15, 1995) (Memorandum of Amicus Curiae Mortgage Bankers Association of America).

**4.** These facts were taken directly from Judge Bandstra's R & R pages 4 through 7.

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). If the Plaintiffs can satisfy the burden of showing numerosity, commonality, typicality, and adequacy of representation, they must then, in this case, meet the requirements of Rule 23(b)(3). Under Rule 23(b)(3), plaintiffs must show, "[1] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3).

The plaintiff has the burden of establishing these specific prerequisites for class certification under Rule 23. *Gilchrist v. Bolger,* 733 F.2d 1551, 1556 (11th Cir. 1984). While courts are not to consider the merits of a plaintiff's claim in determining whether a class is appropriate, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974), "this principle should not be invoked so rigidly as to artificially limit a trial court's examination of the factors necessary to make a reasoned determination whether Rule 23 has been satisfied." *In re Amerifirst,* 139 F.R.D. at 427 (citing *Love v. Turlington,* 733 F.2d 1562, 1564 (11th Cir.1994)).

With respect to this action, Congress intended for courts to certify class actions for causes of action brought under TILA in appropriate cases. *See, e.g.,* 15 U.S.C. § 1640. This is not a per se rule, however, as the Eleventh Circuit has noted:

Congress did not intend ... to make the certification of class actions mandatory in every Truth–in–Lending lawsuit. Courts which have considered the question have properly recognized the permissive rather than mandatory nature of class actions and that the determination of whether to certify a class in the Truth-in-Lending context is still to be made on a case-by-case basis, bearing in mind the traditional prerequisites found in 23(a) and (b).

*Shroder v. Suburban Coastal Corp.,* 729 F.2d 1371, 1377 (11th Cir.1984); *Boggs v. Alto Trailer Sales, Inc.,* 511 F.2d 114 (5th Cir. 1975).

## IV. DISCUSSION AND CONCLUSIONS OF LAW

In Plaintiffs' Motion for Class Certification, they seek to certify a class consisting of all borrowers located anywhere in the United States who satisfy the following criteria:

A. They entered into a transaction which was documented as a consumer credit transaction in that Truth in Lending disclosures were provided;

B. The Truth in Lending disclosures excluded from the "finance charge" and included in the "amount financed," a charge for expedited delivery documents, such as Federal Express or courier fees, Florida or Georgia intangible taxes, tax service fees, review fees, or record subordination of mortgage fees;

C. With respect to the transaction, Kislak is the creditor or first assignee (in whole or part); and

D. With respect to which Kislak has a loan file as of April 25, 1995.[5]

The class period to be certified is one year prior to the filing of this action for the TILA count (Count I); three years for the unfair and deceptive practices claim (Count II); and four years for the unjust enrichment claim (Count III).

After conducting the relevant inquiry, Judge Bandstra found that although the Plaintiffs successfully met the requirements of numerosity, typicality, and adequacy of representation, under Rule 23(a) for the TILA Count, they failed to sustain their burden with respect to commonality under Rule

---

5. Judge Bandstra notes that Plaintiffs redefined their class in a pleading filed after the hearing on the motion for class certification so that the class is now intended to include only those loans to which Kislak has applied its standard policies and practices and excludes loans acquired by bulk purchase. (R & R, p. 3 n. 1.)

23(a), the predominance of common issues of law and fact under Rule 23(b)(3), and superiority of a class action under Rule 23(b)(3). Judge Bandstra also concluded that the Plaintiffs' claims in Counts II and III should not be class certified because of serious commonality problems. In their objections, the Plaintiffs contend that they did in fact meet their burden of proof with respect to the requirements of Rule 23(a) and 23(b)(3).

### A. Common Questions of Law and Fact and Their Predominance.

■ Rule 23(a)(2) requires that a class action raise common questions of law or fact. Although not all questions of fact or law must be common, Rule 23(b) requires that common issues of law or fact predominate over questions affecting the individual class members. The predominance requirement assures that class actions will be judicially economic ways to resolve disputes. Fed.R.Civ.P. 23 (official commentary). Other courts have concluded and this Court agrees that the predominance requirement is not met where liability determinations require individual and fact-specific inquiries. *Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.*, 149 F.R.D. 65, 76 n. 21 (D.N.J.1993); *Hickey v. Great Western Mortgage Corp.*, No. 94 C 3638, 1995 WL 121534 (N.D.Ill. March 15, 1995) (Memorandum Opinion and Order) (decertifying a class in TILA mortgage loan action because plaintiff's agency theory destroyed commonality).

6. The Plaintiffs allege that the TILA claim raises the following common questions:

a. Whether the exclusion of an intangible tax from the TILA finance charge disclosure violates TILA and Regulation Z.

b. Whether the exclusion of a tax service fee from the TILA finance charge violates TILA and Regulation Z.

c. Whether the exclusion of a review fee from the TILA finance charge violates TILA and Regulation Z.

d. Whether the exclusion from the TILA finance charge of an expedited delivery fee shown in a loan file to have been payable to or required or authorized by Kislak violates TILA and Regulation Z.

e. Whether the exclusion from the TILA finance charge of a "record subordination or mortgage" fee violates TILA and Regulation Z.

f. Whether a borrower who receives a Truth in Lending Act disclosure statement which understates the "finance charge" suffers actual damages in the amount of the understatement.

### 1. Count I—Truth in Lending.

■ In support of class certification, Plaintiffs allege that the TILA claims raise common questions of fact and law.[6] While Judge Bandstra recognized that Plaintiffs' enumerated questions raised some common issues, he found that the TILA claim also raises questions that would not be common to the class. He furthermore found that Plaintiffs did not satisfy the requirements of Rule 23(b)(3) because the common questions presented do not predominate over questions affecting individual members of the proposed class.

■ A brief explanation of the disclosure requirements under TILA will aid in the Court's evaluation of this matter. TILA and Reg. Z[7] require lenders to make certain disclosures to consumers regarding charges and fees imposed as part of the cost of extending credit. Creditors must disclose all "finance charges" in the TILA statement to ensure that the costs being charged for credit are not obscured in the price of goods sold. TILA defines a finance charge as the "sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a) (West 1982 & Supp.1995). *See*, Reg. Z, 12 C.F.R. § 226.4(a).

g. Whether a borrower who receives a TILA disclosure statement which understates the "finance charge" is entitled to restitution in the amount of the understatement.

h. Whether passing an overhead expense such as the intangible tax without specifically identifying it as a lender expense that is being passed on to the borrower is deceptive or/results in unjust enrichment.

i. The appropriate measure of damages.

j. The propriety of a declaration that class members with non-purchase-money mortgages are entitled to rescission.

7. Congress charged the Federal Reserve Board with the responsibility of implementing TILA. 15 U.S.C. § 1604 (West 1982 & Supp.1995). In response, the Board formulated Regulation Z ("Reg.Z"), Reg. Z, 12 C.F.R. §§ 226 *et seq.* (1995), which has the force and effect of law. Along with Reg. Z, the Board has prepared and periodically updates official staff commentary interpreting Reg. Z.

██ Where a third party imposes a fee, the Court must examine the facts surrounding the imposition of that fee to determine whether the creditor either directly or indirectly required that fee so as to come under the definition of a finance charge. If the creditor required a third party to perform a service, is aware that the third party will perform the service, and imposes a separate charge on the consumer for the performance of that service, the fee is a disclosable finance charge. *See, Curtis v. Secor Bank,* 896 F.Supp. 1115, 1118–19 (N.D.Ala.1995) (Memorandum and Opinion), citing *Hickey v. Great Western Mortgage Corp.,* No. 94 C 3638, slip. op. at 11, 1995 WL 21633, *4 (N.D.Ill. Jan. 3, 1995). On the other hand, if a third party charges consumers for services not required by the creditor, those fees are not finance charges under TILA. *Id.*

Plaintiffs seek to certify a class that includes those persons who borrowed directly from Kislak as well as loans that were assigned to Kislak by a correspondent or other lender and thus originated by a third party.[8] Plaintiffs allege that correspondents or other lenders act as "agents" of Kislak and pursuant to Kislak's instructions when providing Truth in Lending disclosures to borrowers. Judge Bandstra found that under Plaintiffs' agency theory of liability on the TILA count, in order to prevail, Plaintiffs would have to prove that Kislak is liable for the acts of its correspondents and their closing teams such that Kislak can be said to have indirectly imposed the fees Plaintiffs claim should have been disclosed as finance charges.

Judge Bandstra concluded and this Court agrees that under Plaintiffs' agency theory, Kislak's potential liability for the acts of its correspondent lenders or other closing agents depends directly on whether the correspondent or closing party who allegedly imposed the suspect charge is an "agent" of Kislak such that the correspondent or closing individual's acts may be imputed to Kislak. In order to prevail on a class-wide basis under this theory, Plaintiffs would have to show that every correspondent or closing party was an agent of Kislak for all loans not originated by Kislak so that the correspondent or closing party's acts are imputed to Kislak. Such an analysis would require an individualized determination of whether an agency relationship existed for each particular loan transaction. It is the conclusion of the Court, therefore, that individual issues will predominate over common issues in the Plaintiffs' TILA claim.

In so holding, the Court was persuaded by *Hickey v. Great Western Mortgage Corp.,* No. 94 C 3638, 1995 WL 121534 (N.D.Ill. March 15, 1995) (Memorandum Opinion and Order). *See also, Myers v. Citicorp Mortgage, Inc., et al.,* CIVIL ACTION NO. 94–A–1019–N, 1995 WL 900386 (M.D.Ala. June 15, 1995) (Plaintiffs' claims "would not be common or typical" for class certification where Plaintiffs' loan was not originated by defendants). In *Hickey,* the Court decertified a class in a factually similar TILA action after determining that Plaintiff's agency theory destroyed the basis of commonality. The Court noted that for the Plaintiff to succeed on its agency theory of liability, "Hickey must show that *every* closing person is an agent of the lender so that the closing person's acts are imputed to the lender." *Hickey,* Slip op. at 16, 1995 WL 121534 *7. The Court found that the need to conduct such an "individualized inquiry" meant that "individual issues clearly predominate over common issues." *Id.* After making these conclusions, the Court decertified the class.

██ Many Courts addressing similar TILA finance charge disclosure actions have determined that third party practices raise serious issues of liability. *Curtis v. Secor Bank,* 896 F.Supp. 1115, 1118–19 (N.D.Ala. 1995) (granting summary judgment for defendant); *Cowen v. Bank United of Texas FSB,* Civ. No. A. 94 C 3838, 1995 WL 38978 (N.D.Ill. Jan. 25, 1995) (granting summary judgment for defendant); *Hickey v. Great Western Mortgage Corp.,* No. 94 C 3638, slip. op. at 11, 1995 WL 317095 *4 (N.D.Ill. May 1, 1995) (granting summary judgment for defendant). In actions where complex and fact-specific liability questions exist, the Rule 23 predominance requirement is not met. *Lib-*

---

8. Kislak originates less than 1% of the loans it finances and acquires the majority of its loans through correspondents or other lenders. (R & R, p. 12.)

*erty Lincoln Mercury, Inc. v. Ford Marketing Corp.*, 149 F.R.D. 65, 76 n. 21 (D.N.J. 1993).

■ Plaintiffs argue that there is no need to prove an agency relationship between Kislak and its correspondents, closers, and title companies because the standard form closing instructions mandate that the suspect charges be imposed. (Obj. at 6.) They contend that the fees at issue were imposed at Kislak's direction by way of the closing instructions. However, Judge Bandstra found and the Court agrees that "[t]he fact that Kislak distributed standard closing instructions to its correspondents does not automatically mean that each correspondent or other closing party for each loan was an agent of Kislak so that all of their acts relevant to plaintiffs' claims may be imputed to Kislak." (R & R, p. 14.) *See also, American Title Ins. Co. v. East West Financial*, 16 F.3d 449, 456 (1st Cir.1994) (affirming district court's finding that closing agent was not lender's agent.) While Kislak provides closing instructions to its correspondents which include directions regarding closing fees, the evidence shows that they were not given to every correspondent who sold loans to Kislak. (Evid.Hrg.Tr., pp. 76–77.)

■ In addition, there is uncontradicted evidence in the record that Kislak's correspondents maintain various practices with respect to what fees are actually charged to borrowers and furthermore that practices vary among correspondents and closers regarding whether charges are absorbed by the creditor, paid to the seller, or paid by the buyer. (R & R, p. 5; Evid.Hrg.Tr., 102–104.) Finally, other Courts facing similar factual situations have determined that the act of sending closing instructions raises, at the most, an issue of fact as to whether the correspondent or closing party is an agent of the lender. *Hickey v. Great Western Mortgage Corp.*, No. 94 C 3638, 1995 WL 121534 (N.D.Ill. March 15, 1995). Closing instructions "by themselves do not prove an agency relationship." *Id. See, Baker v. ICA Mortgage Corp.*, 588 A.2d 616 (R.I.1991).

This analysis is further supported by the Federal Reserve Board's proposed commentary of December 14, 1994. In that commentary, the Board offered guidance as to when a courier fee imposed by an independent closing agent should be considered a finance charge. *See,* 59 Fed.Reg. 64351, 64355 (Dec. 14, 1994). If all closing agents and correspondents are agents of the lender, the Board would have no reason to advise on when a courier charge imposed by a third party is a finance charge. *See, Hickey v. Great Western Mortgage Corp.*, No. 94 C 3638 slip. op. 18, 1995 WL 121534, *7 (N.D.Ill. March 15, 1995).

■ The Plaintiffs next argue that the agency liability issue is important to only the expedited delivery fees which constitute but one type of charge challenged by the Plaintiffs. Plaintiffs assert that it would be unnecessary to establish an agency relationship between Kislak and its correspondents, closers, and title companies in terms of the other challenged fees because Kislak is automatically liable for any violations regarding those fees. (Obj., p. 1.) Plaintiffs, however, provide no support for this per se assertion. Nevertheless, should the agency liability problem relate to only one of the challenged fees, this would not change the Court's conclusion or minimize the predominance of individualized inquiries. Establishing an agency relationship for purposes of the expedited delivery charges, alone, would still require individualized legal analysis of thousands of loan transactions. (R & R, p. 14.) Plaintiffs one out of four argument does nothing to alleviate the need for extensive individual inquires.

■ Returning to the R & R, Judge Bandstra alternatively based his finding of no commonality and the predominance of individualized issues on additional factors. He determined that with respect to the thousands of possible loans at issue, individualized factual inquiries would have to be made to determine: (1) which fees are at issue for each loan, (2) whether such fees were properly disclosed, (3) whether such fees were actually charged to the borrower, and (4) the amount of alleged damages to each borrower. (R & R, p. 14.) Again, the Court agrees that these inquires will require thousands of complex and individualized factual determina-

tions thus destroying commonality in this action. For these additional reasons, the Court affirms Judge Bandstra's conclusion the Plaintiffs have failed to sustain their burden with respect to commonality and the predominance of common issues.

### 2. Counts II and III—Unfair and Deceptive Practices and Unjust Enrichment.

■ In Count II, Plaintiffs allege that Kislak engaged in unfair and deceptive trade practices under statutory provisions of all fifty states. Plaintiffs seek restitution equal to all charges which allegedly should have been, but were not, included in the finance charge and improperly included in the amount financed. Judge Bandstra found commonality to be lacking for this claim based, in part, on the agency problems. (R & R, p. 21.) The Court agrees. Again, Plaintiffs would have to prove that each correspondent and closer in thousands of loan transactions under consideration acted as agents of Kislak. In addition, a state-by-state analysis of the unfair and deceptive trade practices statutes as they might apply to Kislak and each of its agents would make such a class wholly unmanageable. The Court finds that Plaintiffs have failed to meet the requirements of class certification for Count II under Rules 23(a) and (b).

In Count III, Plaintiffs assert an unjust enrichment claim based on charges allegedly wrongfully obtained by Kislak and its agents. Judge Bandstra found and the Court agrees, that this claim suffers the same commonality problems as Counts I and II. The unjust enrichment claim would require individual factual determinations as to whether the subject fee was actually charged, by whom, and for whose benefit in each of thousands of loan transactions. (R & R, p. 22.) In addition, the statute of limitations for this claim varies by state, thus, raising additional individualized factual questions. For these reasons,

the Court finds commonality to be lacking with respect to Count III.

### 3. Summary.

Having only analyzed the commonality and predominance of common issues of law and fact over individualized issues with respect to Counts I, II, and III, the Court finds that Plaintiffs have failed to sustain their burden of proof. These claims each present individualized, detailed, specific, and complicated legal and factual issues that the Court would have to resolve on a transaction by transaction basis. Under such conditions, commonality cannot exist and individualized issues clearly overshadow the issues in common.

Although Judge Bandstra found numerous additional problems with Plaintiffs' proposed class, the Court concludes that it is unnecessary to review those findings at this time. The Court will now evaluate the TILA Amendments of 1995, their constitutionality, and how they apply to the current action.

### B. The 1995 TILA Amendments.

■ On September 30, 1995, President Clinton signed into law the 1995 TILA Amendments, Pub.L. 104–29. These Amendments were motivated by concern over how certain judicial decisions might impact the mortgage banking industry in light of the more than fifty class action lawsuits filed following *Rodash v. AIB Mortgage Co.,* 16 F.3d 1142 (11th Cir.1994).[9] 141 Cong.Rec. H9513–01, H9515 (Sept. 27, 1995). Congress concluded that the original intent of TILA was being lost in technical errors and ambiguity surrounding the proper characterization of certain charges. *Id.,* at H9515. As the preamble indicates, the 1995 TILA Amendments were directly intended "to clarify the intent of such Act and to reduce burdensome regulatory requirements on creditors." Pub.L. 104–29. Many of the issues raised in this action regarding what fees

---

9. As Congressman McCollum noted:

 [T]he Truth in Lending Act Amendments of 1995 will finally bring an end to the massive potential liability facing the mortgage industry as a result of extraordinary penalties under the Truth in Lending Act for technical errors. . . . This problem, which seriously threatened the

 viability of residential mortgage lending in this country including the mortgage-backed securities markets, was caused by the ambiguity surrounding the proper treatment of certain charges, and the extremely low tolerance for any error in making disclosures.
 
 141 Cong.Rec. H9515 (Sept. 27, 1995).

constitute finance charges and the applicable tolerance levels, are altered by the Amendments. The Plaintiffs have challenged the constitutionality of the 1995 TILA Amendments.

■■■■ Although the TILA Amendments are primarily prospective, § 139 establishes retroactive limits on lender liability and consumer rescission rights for transactions consummated before September 30, 1995, with respect to the claims of any putative class not certified by January 1, 1995.[10] The Court notes that retroactive legislation is generally unfavored and raises numerous constitutional questions. *Landgraf v. USI Film Prod.*, 511 U.S. 244, ——, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994). The Supreme Court has recognized, however, that certain situations warrant the application of retroactive legislation. *Bradley v. School Bd. Of City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). Where Congress unambiguously intends legislation to apply retroactively, and its application does not violate one of the specific prohibitions against retroactivity contained in the Constitution, then that legislation should be given retroactive effect. *Id.* Based on this guidance, it appears that a clear proclamation of congressional intent moves retroactive legislation away from its unfavored status.

■■■■ It is a finding of this Court that Congress intended for the 1995 TILA Amendments to apply retroactively. The legislative history makes clear that Congress considered how the Amendments would modify existing claims and determined that the limitations on liability should be altered in a way applicable to those existing claims. In addition, as written, the Amendments themselves directly call for retroactive application. Congress could not have passed legislation of this type without expecting retroactive application. *See, Cavaliere v. Margaretten & Co.*, No. 94–cv–1928, 1996 WL 637834 (D.Conn. March 26, 1996) (magistrate judge concluded

that 1995 TILA Amendments were constitutional).

### 1. The Constitutionality of the 1995 TILA Amendments.[11]

The Plaintiffs raise three constitutional questions with respect to the 1995 TILA Amendments, arguing that their application: (1) violates Article III of the Constitution by attempting to legislate the outcome of pending litigation, (2) violates the due process clause and the takings clause by retroactively increasing the amount of finance charges that unnamed class members are obligated to pay, and (3) violates the due process clause by retroactively abrogating the unnamed class members' right to rely on the pendency of this case. The Court will address each of Plaintiffs' constitutional challenges to the 1995 TILA Amendments in turn.

#### a. Separation of Powers.

■■■■ The Plaintiffs argue that the retroactive nature of the 1995 TILA Amendments impermissibly attempt to determine the outcome of pending litigation in violation of Article III of the United States Constitution and the concept of separation of powers. The Plaintiffs mainly rely on *Plaut v. Spendthrift Farm, Inc.*, —— U.S. ——, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) and *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871) to support this proposition. In both *Plaut* and *Klein*, the Supreme Court found that retroactive legislation unconstitutionally interfered with the separation of powers by unduly restraining judicial authority. After reviewing the facts and judicial holdings of those cases, the Court finds Plaintiffs' reasoning unconvincing, particularly in light of *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992) and *Henderson v. Scientific–Atlanta, Inc.*, 971 F.2d 1567 (11th Cir.1992), *cert. denied*, 510 U.S. 828, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993).

In *Plaut*, the Supreme Court held that Congress violated the separation of powers doctrine by enacting a law intended to rein-

---

**10.** This action was filed on July 1, 1994 and no class has been certified to date.

**11.** While the Defendant has raised an interesting standing argument with respect to Plaintiffs' abilities to challenge the constitutionality of the 1995

TILA Amendments, the Court chooses to directly address Plaintiffs' constitutional arguments. In doing so, however, the Court is making no ruling regarding the standing issue.

state certain time-barred Securities Exchange Act § 10(b) claims. The suspect law in *Plaut* directed federal courts to reopen cases where final judgments had been entered to retroactively apply new time limits that would allow the renewal of previously dismissed claims. In finding this law unconstitutional, the Court noted its concern over the potentially detrimental impact to the power of the judiciary in not maintaining the lasting effect of final judgments. *Plaut,* —— U.S. at ——, 115 S.Ct. at 1463. The Court qualified this holding, however, by further noting that where Congress simply "amend[s] applicable law," retroactively applying that law to pending cases would not violate the Constitution. *Plaut,* —— U.S. at ——, 115 S.Ct. at 1452 (quoting *Robertson v. Seattle Audubon Soc'y,* 503 U.S. 429, 441, 112 S.Ct. 1407, 1414, 118 L.Ed.2d 73 (1992)).

Because the 1995 TILA Amendments do not attempt to divest final judgments of their conclusive effect and instead simply amend existing legislation, the Plaintiffs' reading of *Plaut* is overbroad. Furthermore, the Court noted in *Plaut* that, "[w]hatever the precise scope of *Klein* ... later decisions have made clear that its prohibition does not take hold when Congress 'amend[s] applicable law.'" *Plaut,* —— U.S. ——, 115 S.Ct. at 1452, quoting *Seattle Audubon,* 503 U.S. 429, 441, 112 S.Ct. 1407, 1414, 118 L.Ed.2d 73 (1992).

The Court instead finds *Robertson v. Seattle Audubon Soc.,* 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992) and its progeny more relevant to the present action. In *Seattle Audubon,* the Supreme Court upheld a law directing federal courts to find that two specifically named pending cases satisfied certain statutory environmental requirements. *Id.* at 434–35, 112 S.Ct. at 1411–12. The Court concluded that this statute amended already existing law and did not direct a specific outcome. The Eleventh Circuit then used *Seattle Audubon* to reject a separation of powers challenge to a retroactive securities statute in *Henderson v. Scientific–Atlanta, Inc.,* 971 F.2d 1567 (11th Cir.1992), *cert. denied,* 510 U.S. 828, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993). The statute in *Henderson* retroactively nullified a Supreme Court decision, but the Eleventh Circuit not-

ed in upholding the statute that it did "not require courts to make any particular findings of fact or application of law to fact," and "[a]ny effect on pending cases is solely a result of a change in the underlying law." *Id.* at 1573.

In light of *Seattle Audubon* and *Henderson,* Plaintiffs' argument that the 1995 TILA Amendments violate the principle of separation of powers by determining outcomes has no merit. By enacting the TILA Amendments, Congress modified an underlying statute to alter time limits, more clearly define certain terms, and raise tolerance levels. Nothing in these Amendments attempts to alter final judgments or determine outcomes. The Plaintiffs are simply incorrect to propose that because the TILA Amendments impact pending litigation that they violate the separation of powers doctrine. The TILA Amendments revise the substantive standards governing a category of claims, but do not interfere with the judiciary's power to apply the new Amendments to pending cases. It is the conclusion of the Court that Congress did not exceed its authority in enacting the 1995 TILA Amendments.

Finally, Plaintiffs emphasize the constitutional significance of the numerous direct references in the legislative history of the 1995 TILA Amendments to *Rodash v. AIB Mortgage Co.,* 16 F.3d 1142 (11th Cir.1994), as a motivating force in amending TILA. Plaintiffs claim that enacting legislation designed to override judicial decisions violates the separation of powers doctrine. The Court, however, notes that Congress has often introduced retroactive legislation in reaction to specific judicial decisions without creating a separation of powers problem. *See, Rivers v. Roadway Express, Inc.,* 511 U.S. 298, —— n. 5, 114 S.Ct. 1510, 1515 n. 5, 128 L.Ed.2d 274 (1994) ("according to one commentator, between 1967 and 1990, the legislature 'overrode' our decisions at an average of 'ten per Congress'"); *Landgraf v. USI Film Products,* 511 U.S. 244, —— – ——, 114 S.Ct. 1483, 1489–90, 128 L.Ed.2d 229 (1994) (Civil Rights Act of 1991 enacted in response to several judicial decisions).

**1362**

### b. The Due Process Clause.

 The Plaintiffs next assert the 1995 TILA Amendments violate the due process clause and the takings clause because increasing the tolerance levels retroactively alters contracts between the parties and retroactively abrogates the unnamed class members' rights to rely on the pendency of this case.[12] To allege a due process violation, Plaintiffs must first establish that they have a property right in their legal claims. Reviewing the relevant Eleventh Circuit case law, it appears clear that a mere legal claim affords no enforceable property right until a final judgment has been obtained. *Sowell v. American Cyanamid Co.,* 888 F.2d 802, 805 (11th Cir.1989) ("The fact that the statute is retroactive does not make it unconstitutional as a legal claim ·affords no definite or enforceable property right until reduced to a final judgment.") *See also, Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.,* 993 F.2d 269, 273 n. 11 (1st Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 1792, 131 L.Ed.2d 720 (1995) (party's property right in cause of action does not vest "until a final, unreviewable judgment has been obtained.")

 The Court furthermore finds that even if Plaintiffs have a vested property interest in their TILA claims, the 1995 TILA Amendments do not violate the due process clause because they easily survive the rational basis test. The standard established by the Supreme Court in analyzing retroactive economic statutes, requires that they have "a legitimate legislative purpose furthered by rational means." *General Motors Corp. v. Romein,* 503 U.S. 181, 191, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (1992). If the Court finds that the 1995 TILA Amendments sufficiently pass the rational basis test, they do not violate due process.

As noted earlier, the TILA Amendments were enacted to address the filing of multiple class action lawsuits seeking rescission on the basis of technical violations of the TILA disclosure requirements. *See,* 141 Cong.Rec. S14566–03 (Sen. D'Amato, Sept. 29, 1995). These suits clearly threaten the survival of the home mortgage market. Allowing the housing finance industry to face ruin would, in turn, detrimentally impact consumers' ability to obtain residential mortgage financing in the future. 141 Cong.Rec. H9515 (daily ed. Sept. 27, 1995). The Court finds that saving the home mortgage industry constitutes a legitimate legislative interest. Furthermore, the higher tolerance levels and term clarifications contained in the Amendments directly and rationally address this legitimate legislative interest. As applied, the 1995 TILA Amendments constitute a rational solution to the home mortgage crisis and their retroactive application does not violate the due process clause.

Having determined that the 1995 TILA Amendments do not violate due process, the Court will now analyze how these Amendments alter the Plaintiffs claims in the case before us.

### 2. Application of the 1995 TILA Amendments.

 Section 4 of the 1995 TILA Amendments, codified as TILA § 139, provides express limitations on liability for loans that apply directly to this action. Section 139 specifically exempts: (1) TILA class actions for which a final order certifying a class was entered before January 1, 1995; (2) the named individual plaintiffs in any TILA class action filed before June 1, 1995; (3) individual TILA actions or counterclaims filed before June 1, 1995; and (4) consumer credit transactions where the borrower timely rescinded before June 1, 1995. 1995 TILA Amendments, § 4(b) (codified as TILA § 139(b)). The Snyders and the O'Briens, as named Plaintiffs in this action, are not subject to § 139 because this case was filed before June 1, 1995. The claims of the putative class,

---

**12.** Plaintiffs' contention that the 1995 TILA Amendments violate the prohibition on the taking of private property "for public use, without just compensation," U.S. Const. Amend. V, is without merit. Plaintiffs' claims have only been diminished which does not demonstrate a taking.

*Concrete Pipe and Products of Ca., Inc. v. Construction Laborers Pension Trust,* 508 U.S. 602, 644–46, 113 S.Ct. 2264, 2291, 124 L.Ed.2d 539 (1993). Furthermore, the TILA Amendments do not take anything from the Plaintiffs or the proposed class members for a public use.

however, which has not been certified, are governed by § 139.

■■■■ Section 4(a) of the TILA Amendments restricts civil liability for creditors or assignees of creditors on loans originated before the enactment of the 1995 TILA Amendments (September 30, 1995), to those with errors in the finance charge exceeding $200. 1995 TILA Amendments, § 4(a) (codified as TILA § 139(a)(3)(A)). As such, a creditor has no liability for the inaccurate disclosure of the finance charge for pre-September 30, 1995 transactions if the amount or percentage disclosed varies no more than $200 from the actual finance charge. The O'Brien's claim totals only $25 thus falling well below the amended $200 liability threshold.[13] As applied to the O'Briens, the 1995 Amendments prohibit class certification because their individual claim is less than $200 making them unqualified to represent the class Plaintiffs attempt to certify. The Snyders, however, claim that a total of $415.50 was wrongly excluded from the finance charge in their disclosure documents.[14]

■■■■ Other provisions of the 1995 TILA Amendments apply to the Snyder's claim. Section 4 specifically limits liability on existing loans related to "taxes described in section 106(d)(3)." 1995 TILA Amendments, § 4 (codified as TILA § 139(a)(1)(A)). TILA § 106(d)(3), amended by the 1995 TILA Amendments under § 2(c), exempts from the *computation of the finance charge:*

Any tax levied on security instruments or on documents evidencing indebtedness if the payment of such taxes is a precondition

for recording the instrument securing the evidence of indebtedness.

This limitation on taxes applies directly to the Florida Intangible tax and exempts the $132.00 alleged improperly disclosed finance charge on the Snyders' loan. The Court also notes that its decision in *Nussbaum v. Mortgage Service America Co.*, 913 F.Supp. 1548 (S.D.Fla.1995) in combination with *Pignato v. Great Western Bank*, 664 So.2d 1011 (Fla. 4th DCA 1995), make clear that the Florida intangible tax charged to the Snyders does not create any TILA liability. The alleged improperly recorded $132.00 intangible tax will thus not be counted against the $200 tolerance.

■■■■ Kislak contends that § 4 of the 1995 TILA Amendments, as applied, also excludes $102.00 of alleged improperly disclosed Federal Express and courier fees contested by the Snyder's. That section limits liability on existing loans related to "fees and amounts referred to in the 3rd sentence of section 106(a)...." TILA Amendments of 1995, § 4(a) (codified as TILA § 139(a)(1)(C)). The third sentence of TILA § 106(a), which was added by the TILA Amendments of 1995, § 2(a), provides that:

The finance charge shall not include fees and amounts imposed by third party closing agents (including settlement agents, attorneys, and escrow and title companies) if the creditor does not require the imposition of the charges or the services provided and does not retain the charges.

TILA Amendments of 1995, § 2(a). Kislak urges the Court to find that it did not impose or participate in imposing the challenged ex-

---

13. Plaintiffs' claim that Massachusetts has obtained an exemption from the federal TILA statute *is without merit. The absence of TILA § 139* clearly results from an expected lag time in updating since the 1995 TILA Amendments were enacted. Lenders subject to Massachusetts TILA statutes are governed by federal TILA civil liabili-

ty provisions while their disclosure requirements are governed by the Massachusetts TILA statute.

14. The Snyders allege that they received a TILA statement improperly excluding the following items from the finance charge:

| | | |
|---|---|---|
| 1. | $132.00 | Florida Intangible Tax |
| 2. | $100.00 | Review Fee |
| 3. | $ 71.00 | Tax Service Fee |
| 4. | $ 35.00 | Delivery Fee to Suncoast One |
| 5. | $ 25.00 | Delivery Fee to Granger |
| 6. | $ 22.00 | Delivery Fee to Kislak |
| 7. | $ 20.00 | Delivery Fee to Kislak |
| 8. | $ 10.50 | Record Subordination of Mortgage Fee |
| | $415.50 | TOTAL EXCLUDED |

pedited delivery fees on the Snyders and, in turn, exclude those fees for purposes of bringing the Snyder's claim below the $200.00 tolerance level. The Court, however, will not hold that this TILA Amendment acts as a per se rule excluding all expedited delivery fees imposed by third parties. Whether Kislak "required" the imposition of these fees within the meaning of the 1995 Amendments is not a proper issue on a motion for class certification. Such a determination would require further evidentiary findings by the Court. The Snyder's $102.00 of alleged improperly disclosed expedited delivery fees will thus not be excluded. After applying the relevant 1995 TILA Amendments, the Snyder's alleged improperly disclosed fees total $283.50 and do not come under the new $200.00 tolerance.

 The 1995 TILA Amendments do, however, exclude the Snyder's rescission claim. Under § 4, consumers have no extended rescission rights under TILA § 125(f) for loans originated before the enactment date of the 1995 TILA Amendments (September 30, 1995), with respect to:

> any disclosure relating to the finance charge imposed with respect to the transaction if the amount or percentage actually disclosed . . . may, under section 106(f)(2), be treated as accurate for purposes of section 125.

1995 TILA Amendments, § 4(a) (codified as TILA § 139(a)(3)(B)). Section 106(f)(2) outlines new finance charge tolerance limits for rescission under TILA § 125. The new finance charge tolerance levels for rescission are either ½ of 1% or 1% of the loan principal, depending on the nature of the loan. 1995 TILA Amendments, § 3(a) (codified as TILA § 106(f)(2)). These new tolerances apply to the Snyders' request for rescission because the fees at issue are less than the new finance charge tolerances for rescindable loans.[15] The Snyder's claim for improper disclosure ($283.50) is below the Snyder's tolerance level for rescission ($660.00). As a result, the Snyders do not have standing to represent a class seeking rescission based upon the new error tolerance for rescindable loans.[16]

 After applying the 1995 TILA Amendments, the Snyders and the O'Briens have largely been deprived of the necessary standing to represent a class seeking damages and rescission on mortgage loans for the relevant time periods. The O'Briens have only alleged that $25 was mislabeled in their disclosure documents which falls below the $200 liability threshold and the error tolerance for rescindable loans established in the 1995 TILA Amendments. Because the O'Briens cannot satisfy these tolerance levels, they lack standing to represent the class as defined in Plaintiffs' Complaint.

 As applied to the Snyders, the 1995 TILA Amendments do not deprive them of standing to represent the proposed class for damages, but do deprive them of standing to represent the class for rescission. The Snyder's allowable claim of $283.50 is above the $200 tolerance for civil liability, but below the $660.00 rescission tolerance applicable to this action. The Snyders thus have no standing to represent a class seeking rescission in this action.

## V. CONCLUSION

THE Court has considered the motion, and the pertinent portions of the record, and being otherwise fully advised, it is hereby

ORDERED AND ADJUDGED that Plaintiffs' Motion for Class Certification [DE 18] is hereby DENIED.

---

**15.** The new tolerance level for the Snyder's rescission rights is 1% of the original principal amount of the loan because the loan proceeds were used to refinance existing liens on the residence and the only additional loan proceeds that were advanced were used for closing expenses. 1995 TILA Amendments, § 3(a) (codified as TILA § 106(f)(2)(B)). The rescission tolerance level for the Snyders is $660 (1% of $66,000).

**16.** The Court notes that the O'Briens also fall below the error tolerance for rescindable loans. The O'Briens allege only $25 in excluded charges which falls below both the 1% and ½ of 1% tolerance levels. (1% of $152,500 = $1,525; ½ of 1% of $152,500 = $762.50).