Mulligan v. Choice Mortgage          CV-96-596-B    08/11/98   P

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Michael Mulligan and Patricia</u>
<u>Mulligan; for themselves and on</u>
<u>behalf of all others</u>
<u>similarly situated</u>

    v.                                                Civil No. 96-596-B

<u>Choice Mortgage Corp. USA</u>


<u>MEMORANDUM AND ORDER</u>

Michael and Patricia Mulligan (the "Mulligans") bring this class action complaint against Choice Mortgage Corp. USA ("Choice"), alleging violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C.A. § 2607 (West 1989 & Supp. 1998), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. § 1961 <u>et seq.</u> (West 1994 & Supp. 1998), and New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2 <u>et seq.</u> (1995).  The Mulligans also assert that Choice breached the fiduciary duty it owed to class members, breached the terms of its contracts with class members, and committed common-law fraud.  The Mulligans now move pursuant to Fed. R. Civ. P. 23 to certify a class of 113 individuals who entered into residential mortgage transactions in which Choice served as the mortgage broker and received payments from both the borrower and the lender.  For the reasons discussed below, I grant the Mulligans' motion in part and deny it in part.

# I.   BACKGROUND

The Mulligans decided to refinance their home mortgage in early 1996.  To that end, they signed an agreement with Choice, a mortgage broker, to find them a suitable lender.  The agreement specified that Choice would "endeavor to provide [the Mulligans] with the best possible loan program for [their] specific needs."  In return, the Mulligans agreed to pay Choice a 3% brokerage fee and an amount to cover its administrative costs.  Choice eventually secured a mortgage loan for the Mulligans in the amount of $124,000 from Long Beach Mortgage Company ("Long Beach"), a California mortgage lender.  At the closing, the Mulligans paid Choice a $3,720 brokerage fee plus an additional $850 to cover application, document, and processing fees.

The Mulligans allege that, unbeknownst to them, Choice also received a payment of $3,720 from Long Beach in exchange for referring the Mulligans to Long Beach for a mortgage loan at an interest rate higher than that at which Long Beach otherwise would have made the loan.  The Mulligans assert that this payment, which the parties refer to as a "yield spread premium" or "YSP," is either a "referral fee" or a "duplicative charge,"

2

both of which are prohibited by RESPA, 12 U.S.C.A. § 2607(a)&(b), and its implementing regulations, 24 C.F.R. § 3500 et seq. (1997).[1]  They also allege that Choice's inadequately disclosed practice of accepting YSPs in exchange for referring borrowers to mortgage lenders violates RICO, 18 U.S.C.A. § 1961 et seq., and New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2 et seq., and gives rise to various common-law causes of action.

The Mulligans contend that their claims are part of a pattern of misconduct by Choice involving at least 72 other loan transactions and 113 individuals.  Accordingly, they seek to certify a plaintiffs' class of all persons who entered into a residential mortgage loan transaction in which Choice acted as

---

[1]  Mortgage lenders typically send brokers a daily rate sheet setting forth the "par" interest rate at which they will enter into a mortgage loan with a certain class of borrower. Lenders routinely pay an "overage," a type of payment of which a YSP is a particular variety, to brokers who bring in a mortgage loan at an interest rate above that "par" rate.  See Robert M. Jaworski, Overages: To Pay or Not to Pay, That is the Question, 113 Banking L.J. 909, 910 (1996).  The amount of a YSP typically is calculated according to a formula based on the differential between the actual interest rate at which the loan closed and the lender's "par" interest rate.  Id.; Culpepper v. Inland Mortgage Corp., 132 F.3d 692, 694 (11th Cir. 1998).

3

the broker and received payments from both the borrower and the lender.

## II. CLASS CERTIFICATION STANDARDS

To certify a proposed class, the Mulligans first must satisfy the four prerequisites of Rule 23(a) by showing that

> (1) the class is so numerous that joinder of all members is impractical, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). The first two prerequisites, numerosity and commonality, require the named plaintiffs to show that an identifiable class exists. The second two, typicality and adequacy, require the named plaintiffs to establish that they are appropriate representatives of the proposed class. See Rules Advisory Comm. Note to Amended Rule 23, 39 F.R.D. 98, 100 (1966); 1 Herbert Newberg & Alba Conte, Newberg on Class Actions, § 3.01 (3d ed. 1992) ("Newberg"). If these requirements are satisfied, the class then must also meet the characteristics of at least one of the three categories provided in Rule 23(b), which allows class actions where: (1) separate actions by or against individual class members would risk imposing inconsistent obligations on the party opposing the class; (2) "the party

4

opposing the class has acted or refused to act on grounds generally applicable to the class" and injunctive relief is appropriate; or (3) common questions of law or fact predominate and a class action would be the superior method of proceeding. Fed. R. Civ. P. 23(b)(1)-(3). The Mulligans bear the burden of establishing all of the requirements for class certification. Makuc v. American Honda Motor Co., 835 F.2d 389, 394 (1st Cir. 1987).

Although the Supreme Court has stated that a court should not decide the merits of a case at the class certification stage, Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974), a motion to certify "generally involves considerations . . . enmeshed in the factual and legal issues comprising [a] plaintiff's cause of action." Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 (1978) (internal quotations omitted) (quoting Mercantile Nat'l Bank v. Langdeau, 371 U.S. 555, 558 (1963)). This is particularly true with respect to questions of predominance and superiority which necessitate a "close look" at, inter alia, "the difficulties likely to be encountered in the management of a class action." Amchem Prods., Inc. v. Windsor, 117 S. Ct. 2231, 2246 (1997); Manual for Complex Litigation § 30.11 (3d ed. 1995). Consequently, I examine both the nature of the Mulligans' claims and the manner in which they intend to

5

prove those claims in determining whether to grant their request for class certification.

## III. ANALYSIS

The Mulligans argue that their complaint satisfies the Rule 23(a) prerequisites and is eligible for class action treatment under Rule 23(b)(3). I examine each contention in turn.

### A. Rule 23(a) Standards[2]

#### 1. Numerosity

In order to certify a class action, a court must first find that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). As plaintiffs have identified 113 members of the putative class who were borrowers

_____

[2] Choice does not contest the Mulligans' showing as to any element of Rule 23(a). In accordance with this court's obligation to rigorously apply the Rule 23(a) prerequisites to the particular facts of a given case, however, I must look to see if the Mulligans have carried their burden of showing that their claim can proceed under the requirements of the rule. See General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 160-61 (1982).

in 72 separate loan transactions, I find that they have satisfied the numerosity prerequisite.

2. Commonality

To establish commonality, plaintiffs must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Because the class need share only a single legal or factual issue at this stage of the analysis, the commonality prerequisite ordinarily is easily satisfied. 1 Newberg § 3.10, at 3-50. Individualized issues among class members will not necessarily prevent a finding of commonality so long as the class members have at least one issue in common. Rosario v. Livaditis, 963 F.2d 1013, 1017-18 (7th Cir. 1992), cert. denied, 506 U.S. 1051 (1993); Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1197 (6th Cir. 1988). Moreover, where "a question of law refers to standardized conduct of the defendant towards members of the proposed class, commonality is usually met." Curtis v. Commissioner, Maine Dep't of Human Servs., 159 F.R.D. 339, 341 (D. Me. 1994).

The Mulligans have set forth numerous questions of law or fact common to all members of the putative class. With respect to their RESPA claims, for instance, all members will attempt to show that, as a matter of routine practice, Choice never provided goods or services in exchange for the YSP payments and,

7

therefore, such payments were illegal referral fees or duplicative charges. Plaintiffs also assert that each of their non-RESPA claims arise from the standard-form broker-fee agreement executed between Choice and each member of the putative class. They allege that this agreement, in and of itself, gave rise to various duties and obligations on which plaintiffs' causes of action are based. See Arenson v. Whitehall Convalescent and Nursing Home, Inc., 164 F.R.D. 659, 664 (N.D. Ill. 1996) ("Claims arising out of standard documents present a classic case for treatment as a class action." (internal quotations omitted)). Accordingly, I find that the Mulligans have carried their minimal burden of showing the presence of common questions.

   3.  Typicality

   To satisfy the typicality requirement, the class representatives' injuries must arise from the same event or course of conduct as the injuries of other class members, and their claims must be based on the same legal theory. Modell v. Eliot Sav. Bank, 139 F.R.D. 17, 22 (D. Mass. 1991). "The question is simply whether a named plaintiff, in presenting his case, will necessarily present the claims of the absent plaintiffs." Priest v. Zayre Corp., 118 F.R.D. 552, 555 (D. Mass. 1988) (citation omitted). In this case, the Mulligans

8

allege the same injury as each member of the putative class, namely, that they entered into a mortgage loan transaction in which they paid an interest rate higher than they otherwise could have obtained due to Choice's practice of accepting YSPs from mortgage lenders. In trying their case, the named plaintiffs will necessarily present the claims of the other members. Therefore, I find that plaintiffs satisfy the typicality requirement.

4. Adequacy

The final Rule 23(a) prerequisite is that the representative parties must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The inquiry into adequate representation has two parts: (1) whether the interests of the representative parties will conflict with the interests of any class members; and (2) whether the representative parties' counsel is "qualified, experienced and able to vigorously conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985) (citations omitted), cert. denied, 476 U.S. 1172 (1986); accord Curtis, 159 F.R.D. at 341.

I find no evidence of a potential conflict between the named plaintiffs and the other members of the putative class, and Choice alleges none. Additionally, I find that plaintiffs' counsel has adequately demonstrated his qualifications and

9

experience both with respect to class actions in general and with respect to class actions arising from practices similar to those at issue in this case.  Consequently, I find that the Mulligans have satisfied the adequacy of representation prerequisite.

## B.  Rule 23(b)(3) Standards

The Mulligans assert that the class should be certified pursuant to Rule 23(b)(3).[3]  To make their case, plaintiffs must show that: (1) common questions of law or fact will predominate over questions affecting only individual members; and (2) a class action is "superior to other available methods" of adjudicating the case.  Fed. R. Civ. P. 23(b)(3).  These requirements ensure that certification is granted only where the adjudication of common issues in a single action will achieve judicial economies and practical advantages without jeopardizing procedural fairness.  Amchem, 117 S. Ct. at 2249; In re American Med. Sys.,

---

[3]  The Mulligans alleged in their complaint that the class also is eligible for certification under Fed. R. Civ. P. 23(b)(2).  They neglect, however, to argue the point in their motion for certification.  Moreover, even if they had, their efforts would have been to no avail.  Because plaintiffs' suit seeks primarily monetary damages, certification under Rule 23(b)(2) would be inappropriate.  See Rules Advisory Comm. Note to Amended Rule 23, 39 F.R.D. at 102 (Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages."); see also Boughton v. Cotter Corp., 65 F.3d 823, 827 (10th Cir. 1995); Nelsen v. King County, 895 F.2d 1248, 1254-55 (9th Cir. 1990); In re School Asbestos Litig., 789 F.2d 996, 1008 (3d Cir.), cert. denied, 479 U.S. 852 (1986).

Inc., 75 F.3d 1069, 1084 (6th Cir. 1996); 1 Newberg § 4.24, at 4-80; 7A Wright, Miller, and Kane, Federal Practice and Procedure § 1777, at 516 (1986).

I begin by examining the second Rule 23(b)(3) factor, superiority, which depends upon a comparative evaluation of the alternatives to class certification to determine whether a class action is more or less fair, practical, and efficient than the other available methods of adjudication. 1 Newberg § 4.27, at 4-106; 7A Federal Practice and Procedure § 1779, at 551. The most obvious alternative to class certification in this case would be for all plaintiffs to proceed individually by filing separate lawsuits. The named plaintiffs argue that individual suits would be both inefficient, due to the number of plaintiffs, and unfair because many claims may be too small to support a suit. See 1 Newberg § 4.40, at 4-106, Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985). Additionally, the relatively small size of the class, 113 members, its geographic concentration in New Hampshire and Massachusetts, and the relatively small number of transactions at issue in this case, 72, indicate that trying this case as a class action would be manageable. See 1 Newberg § 4.33, at 4-137. Based on the present record, I conclude that class adjudication would be superior to the obvious alternatives and that none of the pertinent factors listed in Rule 23(b)(3)

counsel otherwise.

I next address the issue of predominance. Courts have not developed a precise test to determine whether common issues predominate in a proposed class action but often look for "an essential common link among class members" that can be remedied through litigation. 1 Newberg § 4.25, at 4-86. Thus, common issues are deemed to predominate when the class shares issues of "overriding significance," such as a determination of defendant's liability, so that separate adjudication of individual liability claims would be unnecessary. See 7A Federal Practice and Procedure § 1778, at 534. I consider the Mulligans' showing with respect to each claim in turn.

1. RESPA Claims

The Mulligans argue that the YSPs Choice received are either "referral fees" or "duplicative charges" that are prohibited by RESPA. In determining whether common issues predominate with respect to these claims, I examine RESPA's statutory framework and scrutinize the manner in which plaintiffs propose to prove their claims.

RESPA makes it unlawful for any person to give or receive "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or

a part of a real estate settlement service[4] involving a federally related mortgage loan shall be referred to any person." 12 U.S.C.A. § 2607(a). The Act also makes it unlawful for any person to give or receive "any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C.A. § 2607(b). RESPA's implementing regulations further provide that any "charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates [RESPA]." 24 C.F.R. § 3500.14(c). The Mulligans argue that the YSPs at issue are illegal referral fees because they were paid to compensate Choice for referring customers for loans at above-par rates. They alternatively contend that the YSPs are illegal duplicative charges because Choice had already fully charged the plaintiffs for any services that it provided in connection with the processing of their loans.

RESPA contains an exemption covering "the payment to any

---

4 The Act defines "settlement services" broadly to include "any service provided in connection with . . . the origination of a federally related mortgage loan (including but not limited to, the taking of loan applications, loan processing and the underwriting and funding of loans) . . . ." 12 U.S.C.A. § 2603(3) (Supp. 1998).

13

person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed . . . ." 12 U.S.C.A. § 2607(c)(2). The Act's implementing regulations further explain this exemption by stating that

> [i]f the payment of the thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually provided. These facts may be used as evidence of a violation of section [2067] and may serve as a basis for a RESPA investigation.

24 C.F.R. § 3500.14(g)(2). Choice relies on this exemption in contending that individual issues predominate over any common questions. Its position rests upon the assumption that the trier of fact will not be able to determine whether any of the loans at issue are subject to the exemption without first making a case-by-case determination as to whether the amount of the YSP Choice received in any particular case bore a "reasonable relationship" to the market value of any services Choice provided to the lender or borrower in that case.

The fatal flaw in Choice's argument is that it fails to address plaintiffs' claim that Choice violated RESPA because it failed to provide <u>any</u> legitimate goods or services in exchange for the YSPs it received. If this assertion can be proved at trial through evidence common to the entire class, it will not be necessary to conduct a case-by-case inquiry of the reasonableness

14

of any particular YSP as the trier of fact will already have determined that Choice failed to render any compensable goods or services in exchange for the YSPs it received.  See Culpepper v. Inland Mortgage Corp., 132 F.2d 692, 697 (11th Cir. 1998).

The Mulligans claim that they will prove on a class-wide basis that Choice did not provide any legitimate goods or services to earn the YSPs at issue.  They argue that Choice could not have provided "goods" to the lenders since it never had any ownership interest in any of the mortgage loans.  See id. at 696; Hastings v. Fidelity Mortgage Decisions Corp., 984 F. Supp. 600, 612 (N.D. Ill. 1997); Dubose v. First Sec. Sav. Bank, 974 F. Supp. 1426, 1430 (M.D. Ala. 1997).  They also argue that Choice could not have earned the YSPs by providing services to the borrowers since each member of the proposed class must have already paid for the services he or she received from Choice in order to qualify for membership in the class.  See Culpeper, 132 F.3d at 696-97.  Finally, they assert that they will demonstrate on a class-wide basis that the YSPs Choice received were paid as referral fees by showing that the magnitude of the YSPs varied exclusively according to the difference between the "par" interest rate and the interest rate at which the mortgage closed, without reference to the kind or degree of services performed.  See Culpepper, 132 F.3d at 697.  Choice has failed to offer any

15

evidence or argument to counter these assertions.[5]  Nor has it otherwise explained why plaintiffs' RESPA claims cannot be litigated on a class-wide basis.  Accordingly, I grant the Mulligans' motion to certify the class insofar as it applies to plaintiffs' RESPA claims.

2. RICO Claim

To prevail on their civil RICO claim, plaintiffs must establish, inter alia, a "pattern of racketeering activity" consisting of at least two "predicate acts" of racketeering activity.  See 18 U.S.C.A. §§ 1961(1)&(5), 1962, 1964; Ahmed v. Rosenblatt, 118 F.3d 886, 888 (1st Cir. 1997), cert. denied, 118 S. Ct. 1165 (1998).  RICO defines a predicate act as any act indictable under any one or more of certain laws set forth in 18 U.S.C.A. § 1961(1).  Ahmed, 118 F.3d at 888-89.  The Mulligans allege that Choice violated three such laws: the federal statute prohibiting mail fraud, 18 U.S.C.A. § 1341 (West 1984 & Supp. 1998); the federal law prohibiting wire fraud, 18 U.S.C.A. § 1343

---

[5] Choice repeatedly asserts that class certification is inappropriate because the payment or receipt of YSPs is not per se unlawful.  This argument misses the point.  While it is true that not all YSPs violate RESPA, it does not necessarily follow that a RESPA claim can never be suitable for certification as a class action.  In this case, the evidence demonstrates that plaintiffs' RESPA claims will succeed or fail predominantly because of issues common to the class as a whole.  Accordingly, common issues predominate over questions pertaining only to individual class members.

16

(West 1984 & Supp. 1998); and the Travel Act, 18 U.S.C.A. § 1952 (West 1984 & Supp. 1998). In order to determine whether plaintiffs' RICO claim should be certified, I must look at the substantive elements of each alleged predicate offense and determine whether, in attempting to prove that Choice violated each statute, the resolution of common issues will predominate over the resolution of issues particular to individual class members. See Amchem, 117 S. Ct. at 2246.

(a) Mail and Wire Fraud

"To prove mail and wire fraud, [plaintiffs] must prove . . . (1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails or interstate wire communications in furtherance of the scheme." United States v. Sawyer, 85 F.3d 713, 723 (1st Cir. 1996). Additionally, in order to successfully maintain a civil RICO action stemming from mail and wire fraud, plaintiffs must also demonstrate that they relied upon defendant's scheme or artifice to defraud. See Andrews v. American Tel. & Tel. Co., 95 F.3d 1014, 1023-24 (11th Cir. 1996); O'Malley v. O'Neill, 887 F.2d 1557, 1563 (11th Cir.), cert. denied, 498 U.S. 926 (1989); Blount Fin. Servs., Inc. v. Walter E. Heller & Co., 819 F.2d 151, 152 (6th Cir. 1987); Martin v. Dahlberg, Inc., 156 F.R.D. 207, 215 (N.D. Cal. 1994).

17

Some courts have held that class certification is appropriate notwithstanding individual questions of reliance. See e.g., Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir.), cert. denied, 474 U.S. 946 (1985); In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 516 (D.N.J. 1997); Holton v. L.F. Rothschild, Unterberf, Towbin, 118 F.R.D. 280, 283 (D. Mass. 1987). I agree, however, with the majority view that certification generally is inappropriate when individual reliance is an issue. See, e.g., Andrews, 95 F.3d at 1025; Castano v. American Tobacco Co., 84 F.3d 734, 745 (5th Cir. 1996); Simon, 482 F.2d at 882; In re One Bancorp Sec. Litig., 136 F.R.D. 526, 533 (D. Me. 1991). As the Supreme Court stated in Basic Inc. v. Levinson, "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would . . . prevent[] . . . proceeding with the class action, since individual questions then would . . . overwhelm[] the common ones." 485 U.S. 224, 242, 250 (1988) (upholding district court's certification of securities fraud class where reliance could be presumed based on "fraud-on-the-market" theory). There is nothing unusual about this case that would warrant a departure from the general rule. Accordingly, I find that in trying plaintiffs' mail and wire fraud claims, individual questions of whether each individual plaintiff relied upon Choice's alleged

18

fraudulent scheme would predominate over any issues common to the class as a whole. Consequently, I reject plaintiffs' attempt to rely on their allegations of mail and wire fraud to support their request to certify their RICO claim for class action treatment.[6]

    (b) <u>The Travel Act</u>

The Travel Act, which serves as a RICO predicate act, 18 U.S.C.A. § 1961(1), prohibits "travel[] in interstate or foreign commerce or use[] of the mail or any facility of interstate or foreign commerce, with intent to (1) distribute the proceeds of any unlawful activity; or . . . (3) otherwise promote, manage, establish, [or] carry on . . . any unlawful activity." 18 U.S.C.A. § 1952(a). "Unlawful activity" is defined as, inter alia, "extortion, bribery, or arson committed in violation of the laws of the State in which committed . . . ." <u>Id.</u> § 1952(b). Plaintiffs contend that in accepting YSPs in exchange for

---

[6] Reliance is also an essential element of plaintiffs' common-law fraud claim. <u>See</u> <u>Jay Edwards, Inc. v. Baker</u>, 130 N.H. 41, 46-7 (1987); <u>see</u> <u>also</u> <u>Alexander v. Fujitsu Bus. Communications Sys., Inc.</u>, 818 F. Supp. 462, 467 (D.N.H. 1993). For this reason, I conclude that certification of plaintiffs' fraud claim would be inappropriate. <u>See</u> <u>Castano</u>, 84 F.3d at 745; <u>In re One Bancorp</u>, 136 F.R.D. at 533; <u>see</u> <u>also</u> <u>Rules Advisory Comm. Note to Amended Rule 23</u>, 39 F.R.D. at 103 ("[A]lthough having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in . . . the kinds or degrees of reliance by the persons to whom [the fraudulent conduct was] addressed.").

referring their above-par mortgage loans to various lenders, Choice violated New Hampshire's commercial bribery statute and, concomitantly, the Travel Act.

> A person is guilty of commercial bribery in New Hampshire
>
> when, without the consent of employer or principal, contrary to the best interests of the employer or principal:
> (b) He, as an employee, agent or fiduciary of such employer or principal, solicits, accepts or agrees to accept any benefit from another upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs . . . .

N.H. Rev. Stat. Ann. § 638:7(I)(b) (1996). Thus, under the terms of the statute, plaintiffs will have to show that Choice acted as plaintiffs' "employee, agent or fiduciary" in the mortgage loan transactions. Cf. Hastings, 984 F. Supp. at 606 (in order to assert Travel Act violation stemming from Illinois's commercial bribery statute, plaintiff must allege agency relationship).

Determining the presence of an agency relationship is a question of fact. Carrier v. McLlarky, 141 N.H. 738, 739 (1997). The New Hampshire Supreme Court has adopted the approach advocated in the Restatement (Second) of Agency, see ERA Pat Demarais Assoc., Inc. v. Alexander Eastman Found., 129 N.H. 89, 91 (1986), which defines "agency" as "the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his

20

control, and consent by the other to so act." Restatement (Second) of Agency § 1 (1958). An agency relationship exists only when "a principal gives authority to another to act on his or her behalf and the agent consents to do so." Carrier, 141 N.H. at 739 (citing Fleet Bank-N.H. v. Chain Constr. Corp., 138 N.H. 136, 139 (1993) and 93 Clearing House, Inc. v. Khoury, 120 N.H. 346, 348-49 (1980)). "The granting of [such] authority and consent need not be written, but 'may be implied from the parties' conduct or other evidence of intent.'" Id. (quoting Khoury, 120 N.H. at 349). That a written agreement specifically declares one party to be an "agent" of another, however, is not necessarily determinative of the issue. See Restatement (Second) of Agency § 1 cmt. b. & illus. 2. Rather, a court must "ascertain the factual relationship of the parties to each other" to see if it supports the existence of the legal agency relationship. Id.

Plaintiffs will not be able to rely exclusively on the language of the broker-fee agreements to establish the existence of an agency relationship. Rather, each class member will have to prove by referring to the facts and circumstances surrounding each individual transaction that an agency relationship arose between Choice and the particular class member. See id.; Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 44

(1st Cir. 1995) (existence and scope of agency relationship determined based on the facts and circumstances relevant to the alleged relationship); Barboza v. Ford Consumer Fin. Co., No. CIV.A.94-12352-GAO, 1998 WL 148832, at *4 (D. Mass. Jan. 30, 1998) (Proving the presence of an agency relationship "will require individual proof, because the nature of the relationship is not universally established but rather is set by the actual dealings between the individual borrower and the individual broker."). I find that this individualized inquiry will likely predominate over any questions common to the class and, therefore, plaintiffs' allegation of Travel Act violations stemming from Choice's alleged participation in a commercial bribery scheme cannot support certification of their RICO claims. See Barboza, 1998 WL 148832, at *4 (denying certification because of individual factual issues relating to existence of agency relationship); O'Brien v. J.I. Kislack Mortgage Corp., 934 F. Supp. 1348, 1358 (S.D. Fla. 1996) (same); Hickey v. Great W. Mortgage Co., No. 94-C-3638, 1995 WL 121534, at *7 (N.D. Ill. May 17, 1995) (same).

Because plaintiffs would need to prove the elements of one or more of these predicate offenses in order to state a claim under RICO and because individual issues would predominate over any common issues in proving certain elements of each of those

22

offenses, I decline plaintiffs' request to certify their RICO claim for class action treatment.

    3.   <u>Breach of Fiduciary Duty Claim</u>

Certification of plaintiffs' common-law breach of fiduciary duty claim would be equally inappropriate. Determining the existence of a fiduciary relationship involves a highly individualized inquiry into whether the facts of a given transaction establish that "there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence." <u>Lash v. Cheshire County Sav. Bank</u>, 124 N.H. 435, 439 (1984) (quoting <u>Ford v. Guarantee Abstract & Title Co.</u>, 553 P.2d 254, 267 (Kan. 1976)). Thus, in proving the existence of a fiduciary relationship, each class member will have to prove that he or she "reposed confidence" in Choice, rather than treated his or her transaction as merely an arm's-length dealing between two actors in the marketplace. <u>Id.</u> at 438. Proving the existence of such a relationship on a plaintiff-by-plaintiff basis likely would predominate over the resolution of any issues common to the class. <u>See</u> <u>Kaser v. Swann</u>, 141 F.R.D. 337, 341-42 (M.D. Fla. 1991) (declining to certify class alleging breach of fiduciary duty because proving existence of fiduciary relationship on individual basis would

23

predominate over common questions). Consequently, I decline to certify plaintiffs' breach of fiduciary duty claim for class action treatment.

4. Breach of Contract Claim

Plaintiffs contend that the written broker-fee agreement constituted a binding contract. Pursuant to the express terms of that contract, Choice undertook the obligation "to provide [plaintiffs] with the best loan program for [their] specific needs." In exchange, plaintiffs agreed to pay Choice a brokerage fee upon the loan's closing. By knowingly providing them with a loan arrangement that included an interest rate higher than what the mortgage lender otherwise would have charged, plaintiffs contend Choice breached that contract. Plaintiffs now seek to certify a class of those who, inter alia, signed similar agreements with Choice, alleging that the resolution of the common issue of whether Choice's actions were in breach of the agreements would predominate over any questions particular to individual class members.

Choice, on the other hand, contends that resolution of plaintiffs' breach of contract claim would require individual inquiries into the statements made by Choice to each member of the putative class, the intent of each member, Choice's obligations under each agreement, and the extent to which Choice

24

lived up to those obligations. Additionally, Choice contends that adjudicating the breach of contract claim would necessitate inquiry into the "specific needs" of each class member and a comparison of those needs to the terms of the loan program arranged by Choice. In light of these questions particular to each individual transaction, Choice contends that common issues will not predominate and, therefore, certification would be inappropriate. I disagree.

Each member of the putative class signed a standard-form broker-fee agreement that did not vary in any material respect from plaintiff to plaintiff. Thus, this is not a case in which plaintiffs contend that oral representations became binding terms of the contract or in which the terms of the contract varied significantly from document to document. In either case, certification may be inappropriate. See Marcial v. Coronet Ins. Co., 880 F.2d 954, 958 (7th Cir. 1989) (upholding district court's refusal to certify class for breach of contract claim where oral representations were involved); Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 482 F.2d 880, 882 (5th Cir. 1973) (finding certification may be inappropriate where "writings contain material variations").

In addition, that the parties' intent will be relevant to determining the terms of the broker-fee agreement does not mean

that resolution of the breach of contract claim will require inquiry into each individual transaction.  Rather, in New Hampshire the interpretation of a contract presents a question of law for the court.  <u>Gamble v. University Sys. of N.H.</u>, 136 N.H. 9, 13 (1992).  New Hampshire courts determine the contracting parties' intent based on an objective standard, considering the meaning that a reasonable person would attach to the terms of the contract, "rather than on [the parties'] subjective, unmanifested states of mind."  <u>C & M Realty Trust v. Wiedenkeller</u>, 133 N.H. 470, 476 (1990) (citing <u>Kilroe v. Troast</u>, 117 N.H. 598, 601 (1977)).  Here, plaintiffs contend that the express terms of the broker-fee agreement clearly delineate the scope of the parties' respective obligations.  Thus, determining each party's obligations under the agreement in any particular case would not necessarily require looking beyond the agreement itself.  <u>See Leszczynski v. Allianz Ins.</u>, 176 F.R.D. 659, 671-72 (S.D. Fla. 1997); <u>Arenson</u>, 164 F.R.D. at 665-66; <u>Kleiner v. First Nat'l Bank of Atlanta</u>, 97 F.R.D. 683, 692 (N.D. Ga. 1983) ("[C]laims arising from interpretation of a form contract appear to present the classic case for treatment as a class action. . . .").

Finally, I am unpersuaded by Choice's argument that adjudicating these claims would require individual determinations as to each member's "specific needs."  It seems highly unlikely

26

that any member of the putative class had a "specific need" to borrow money at an interest rate higher than that at which the lender was otherwise willing to charge. Consequently, I find that the resolution of the central question common to the breach of contract claims would predominate over any individual questions. Therefore, certification of this claim is appropriate. See Leszczynski, 176 F.R.D. at 671; Arenson, 164 F.R.D. at 665-66.

5. Consumer Protection Act Claim

Plaintiffs contend that Choice's practice of promising in the standard-form broker-fee agreement to identify "the best loan program for [their] specific needs" while, in fact, consistently obtaining loan arrangements with artificially high interest rates in exchange for illegal referral fees constitutes an "unfair and deceptive" trade practice in violation of New Hampshire's Consumer Protection Act ("CPA"), N.H. Rev. Stat. Ann. § 358:A-2 (1995). Section 358:A-2 provides, in relevant part, that "[i]t shall be unlawful for any person to use any method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within the state." Acts in violation of the CPA include "[r]epresenting that . . . services have . . . characteristics . . . that they do not have." Id. § 358:A-2(V). Additionally, the CPA specifically allows plaintiffs to bring a

27

suit under its terms as a class action "if the unlawful act or practice has caused similar injury to numerous other persons." N.H. Rev. Stat. Ann. § 358:A-10-a (1995).

New Hampshire courts use an objective standard to determine whether acts or practices are "unfair or deceptive" in violation of the CPA. In order to come within the CPA, "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Barrows v. Boles, 141 N.H. 382, 390 (1996) (quoting Levings v. Forbes & Wallace, Inc., 396 N.E.2d 149, 153 (Mass. App. Ct. 1979)). For such conduct to be actionable, the plaintiff need not show that he or she actually relied on the deceptive acts or practices, see Fraser Eng'g Co. v. Desmond, 524 N.E.2d 110, 112 (Mass. App. Ct. 1988)[7], or that "actual confusion or misunderstanding" resulted, N.H. Rev. Stat. Ann. § 358:A-11 (1995). Rather, a CPA plaintiff need only establish a causal link between the conduct at issue and his or her injury. See N.H. Rev. Stat. Ann. § 358:A-10 (1995) (conferring right to bring private action under CPA to "[a]ny person injured by

_____

[7] In applying the CPA, the New Hampshire Supreme Court frequently looks for guidance to the "'well developed'" case law construing the analogous Massachusetts unfair and deceptive practices' act, Mass. Gen. Law. ch. 93A. Chroniak v. Golden Inv. Corp., 983 F.2d 1140, 1146 n.11 (1st Cir. 1993) (quoting Chase v. Dorais, 122 N.H. 600, 602 (1982)).

28

another's use" of unfair or deceptive acts or practices); <u>see also Moynihan-North Reading Lumber, Inc. v. Burke</u>, No. 9367, 1996 WL 528926, at *3 (Mass. App. Div. Sept. 9, 1996).

I find that the resolution of the primary common question relevant to plaintiffs' CPA claim -- whether Choice's practice constitutes an "unfair and deceptive act or practice" under the Act -- will likely predominate over the resolution of any potential questions particular to individual class members. <u>See Rosario</u>, 963 F.2d at 1017-18 (existence of unfair and deceptive trade practices a question common to class); <u>Dickson v. Chicago Allied Warehouses, Inc.</u>, No. 90 C 6161, 1993 WL 362450, at *8 (N.D. Ill. Sept. 15, 1993) (finding such common question to predominate); <u>Martin</u>, 156 F.R.D. at 217-18 (same). The alleged deceptive acts upon which plaintiffs base their claim appear on the face of a standard-form agreement that each member of the putative class signed. Consequently, whether the signed agreements evidence a course of conduct that rises to the level of "rascality" necessary to bring them within the CPA's reach is a question amenable to proof on a class-wide basis.

Additionally, that the issue of causation must be resolved on an individual basis does not necessarily mean that the resolution of the common question will not predominate. As noted above, the class members will not have to show that they relied

29

on Choice's conduct in entering into their respective loan transactions. See Fraser, 524 N.E.2d at 112. Moreover, no class member will have to specifically show actual "confusion or misunderstanding" as a result of Choice's conduct. See N.H. Rev. Stat. Ann. § 359:A-11. Rather, plaintiffs will have to carry a much less onerous burden, showing only that their injuries (i.e., that they are locked into loans at interest rates higher than otherwise available) was a consequence of Choice's allegedly unfair and deceptive practices (i.e., securing for them loans at interest rates higher than otherwise available). See Fraser, 524 N.E.2d at 112; Moynihan-North Reading Lumber, Inc., 1996 WL 528926, at *3. I find that determination of the causation issue will not overwhelm the central common question of "overriding significance," see 7A Federal Practice and Procedure § 1778. Consequently, certification of this claim is appropriate.

## IV. CONCLUSION

Plaintiffs have satisfied the prerequisites of Rule 23(a)(1)-(4) and the class, with respect to the RESPA, breach of contract, and CPA claims, may be certified under Rule 23(b)(3). Therefore, I order that plaintiffs' class be certified as a Rule 23(b)(3) class for purposes of determining defendant's liability on these claims. Thus, plaintiffs' motion to certify (document

30

no. 46) is granted in part and denied in part.  Plaintiffs shall
provide notice to all potential class members in a manner
consistent with Fed. R. Civ. P. 23(c)(2).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

August 11, 1998

cc:   Richard Mills, Esq.
      Edward K. O'Brien, Esq.

31